> This filing is identical to ECF 171 with a top margin added to the exhibit pages so that the new ECF stamps do not obscure the prior ECF stamps.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

DR. PANKAJ MERCHIA, M.D.,

   Plaintiff,

v.                                                4:20-cv-40100-IT

MARCUS & MILLICHAP, INC., et al.,

   Defendants.

---

**PLAINTIFF'S MOTION TO CLARIFY AND RECONSIDER ELECTRONIC ORDER [ECF 170]**

> This filing is identical to ECF 171 with a top margin added to the exhibit pages so that the new ECF stamps do not obscure the prior ECF stamps.

Plaintiff respectfully seeks leave to file pursuant to Elec. Order 159.

Plaintiff Dr. Pankaj Merchia respectfully moves, pursuant to Fed. R. Civ. P. 54(b) and 60(b)(1)-(6), for (1) clarification of the Court's Electronic Order dated yesterday, June 17, 2025 (ECF 170) and (2) reconsideration of the ruling to the extent it denied leave to file the underlying Rule 60(b)(6) motion.

---

**I. NARROW RELIEF SOUGHT**

1. **Clarification.** Plaintiff asks the Court to confirm whether Exhibit 110 (filed at ECF 128-5) was considered in resolving Defendants' motions to dismiss and, if so, to identify where that consideration is reflected in the Court's Memorandum & Order (ECF 134) and subsequent electronic orders.

2. **Reconsideration.** If Exhibit 110 was overlooked, Plaintiff asks the Court to revisit ECF 134 (and, by extension, ECF 170) because the Exhibit squarely contradicts the finding that "Merchia has ... failed to state a claim where he does not allege any further involvement by M&M after it sent the September 30, 2020 counteroffer." ECF 134 at 11 ¶1

## II. PROCEDURAL BACKGROUND

| Date | Event | Docket |
|---|---|---|
| 28 Apr 2022 | Opposition to M&M's motion to dismiss, attaching **Ex. 110** | 128-5 |
| 03 Mar 2023 | Memorandum & Order dismissing claims against M&M (ECF 134) | 134 |
| 03 Mar 2023 | Final Judgment entered | 135 |
| 03 Jun 2025 | Motion for leave to file Rule 60(b)(6) motion (ECF 169) | 169 |
| 06 Jun 2025 | Electronic Order denying leave (ECF 170) | 170 |

## III. ARGUMENT

### A. Legal Standard

A district court "possesses the inherent power to reconsider its interlocutory orders" *at any time prior to entry of judgment* and, thereafter, under Rule 60(b) where "extraordinary circumstances" or "manifest errors of law or fact" are shown. *See* Fed. R. Civ. P. 54(b); *Gonzalez v. Crosby*, 545 U.S. 524, 536 (2005).

### B. Exhibit 110 Creates a Direct Factual Conflict With ECF 134

1. **Content of Exhibit 110.**

    - On **9 October 2020**—nine days **after** the September 30 counter-offer—broker Harrison Klein of M&M emailed Plaintiff:

    "Once this [Lamb-drafted lease] is signed we are good to give you keys."

    - This e-mail chain shows Attorney Martin Lamb transmitting a lease to M&M and seller Krug containing **hand-written revisions that (a) postponed closing and (b) imposed additional title costs**. Id.

2. **Why the Exhibit Matters.**

    o The Court dismissed Plaintiff Dr. Merchia's claims, because it repeatedly found in its Memorandum & Order (ECF 134) that Marcus & Millichap provided *no* "substantial assistance" after September 30, 2020

    1. **ECF 134 at 11 (first ¶).**

        "Merchia has … failed to state a claim where he does not allege *any further involvement by M&M after it sent the September 30, 2020 counteroffer*."

    2. **ECF 134 at 15 (first full ¶).**

        "Merchia's allegations regarding M&M's conduct fall short of substantial assistance in the alleged conspiracy [because] after M&M sent the counteroffer to Merchia on September 30, 2020, *M&M had no further involvement and took no further action*".

    o Exhibit 110 is "central to the complaint," see *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 12 (1st Cir. 2004), and was pleaded at SAC ¶¶ 31–33, 44 .

    o The Exhibit demonstrates **post-September 30 coordination** between Lamb and Klein to delay the closing and demand "extra costs," thereby reviving Plaintiff's fraud, conspiracy, and Chapter 93A theories.

3. **Overlooked Evidence Warrants Reconsideration.**

    o Where dispositive evidence was **inadvertently overlooked**, courts routinely grant Rule 60(b)(1) or (6) relief. *See Klapprott v. United States*, 335 U.S. 601, 614 (1949).

**C. Good-Faith Basis for Rule 60(b) Motion**

Plaintiff's proposed Rule 60(b)(6) motion (ECF 169-1) was timely filed, detailed the oversight, and explained the extraordinary circumstance of simultaneous criminal proceedings that consumed counsel-less Plaintiff's capacity—a factor the Supreme Court deemed compelling in *Klapprott*. See ECF 169-1 at 6 & n.25 .

## IV. REQUESTED CLARIFICATION & RELIEF

1. **Clarify** whether Exhibit 110 was considered in deciding ECF 134 and ECF 170.

2. **If not considered,** vacate ECF 170, grant leave for the Rule 60(b)(6) motion to be docketed, and set a briefing schedule; or, in the alternative, state under Fed. R. Civ. P. 62.1 that the motion "raises a substantial issue" so that the First Circuit may remand for full consideration.

## V. CONCLUSION

Because Exhibit 110 directly impeaches predicate factual findings in ECF 134, justice and efficiency favor the limited relief requested.

Respectfully submitted,
**/s/ Pankaj Merchia, M.D.**
Pankaj Merchia, M.D.
Email: PMerchiaLegal@gmail.com

***Attachments – <u>Please read annotations in Red, which are part of this filing</u>***:
Relevant pages from Court order (ECF 134)
Relevant pages from Operative Complaint (ECF 119) that describe Exhibit 110
Exhibit 110 of opposition to motion to dismiss (ECF 128)

**CERTIFICATE OF SERVICE**

I certify that on this date a true copy of the foregoing motion was served via the Court's CM/ECF system on all counsel of record.

**/s/ Pankaj Merchia, M.D.**

**Court finding that Merchia did not allege involvement by M&M after September 30, 2020 in contradiction to Merchia's opposition to MTD Exhibit 110.**

which by the agreed-upon terms was not required at the time Merchia wired the funds to Lamb to be held in escrow. To the extent that Merchia relies on the October 1, 2020 email to allege that M&M made a false representation regarding the seller's intentions to delay the closing until November to avoid short-term capital gains taxes, ==Merchia has similarly failed to state a claim where he does not allege any further involvement by M&M after it sent the September 30, 2020 counteroffer.==

Nor can Merchia state a claim for fraudulent concealment. Although Massachusetts law recognizes that cause of action, see In re Neurontin Mktg., Sales Pracs. & Prod. Liab. Litig., 618 F. Supp. 2d 96, 113 (D. Mass. 2009), "[l]iability for nondisclosure exists under Massachusetts law only where there is a duty to disclose," Taylor v. Am. Chemistry Council, 576 F.3d 16, 31 (1st Cir. 2009). Here, M&M only owed a duty of reasonable care, see DeWolfe v. Hingham Ctr., Ltd., 464 Mass. 795, 800, 985 N.E.2d 1187, 1192 (2013), but not a fiduciary duty that required disclosure of internal details related to the finalization of the sale.

Merchia relies on additional exhibits attached to his Opposition [Doc. No. 128] for further arguments. Those documents are not properly before the court on a motion to dismiss. See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (holding that, barring certain "narrow exceptions" not present here, "any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden" on a motion to dismiss). Even if Merchia were to amend his complaint to include the additional exhibits such that the court could consider them, the exhibits do not change the analysis. For example, Merchia attaches an October 13, 2020 email chain in which Klein is copied on emails between Lamb and Krug about, inter alia, the capital gains tax to argue that the tax issue was the cause for the closing not occurring by the October 21, 2020 deadline. See Ex. 109 [Doc. No. 128-4]. That email may support the claim that

11

> Court finding that Merchia did not allege involvement by M&M after September 30, 2020 in contradiction to Merchia's opposition to MTD Exhibit 110.

sufficient to survive a motion to dismiss." Brennan v. Ferreira, 251 F. Supp. 3d 338, 343 (D. Mass. 2017).

==Merchia's allegations regarding M&M's conduct fall short of substantial assistance in the alleged conspiracy.== As previously discussed, the September 30, 2020 counteroffer, and Merchia's subsequent acceptance, was not a misrepresentation, but rather a counteroffer that Merchia was free to accept or reject. Merchia has alleged no facts to indicate that M&M had any knowledge or intent to engage in tortious conduct to misrepresent the terms of the sale when it communicated the seller's offer to Merchia. See Grant, 183 F. Supp. 2d at 364 ("Because a conspiracy requires an agreement to commit a wrongful act, none can exist where an alleged participant lacks knowledge that a wrongful act is being perpetrated."). As alleged in the Second Amended Complaint [Doc. No. 119], ==after M&M sent the counteroffer to Merchia on September 30, 2020, M&M had no further involvement and took no further action== other than confirming receipt of Krug's email that did not materially contradict the terms of the agreement.[5]

Accordingly, M&M's Motion to Dismiss [Doc. No. 123] is GRANTED as to Count IV.

C.   *Leave to Amend*

Merchia requests at the end of his opposition that if the court is inclined to grant M&M's motion, that he be granted leave to amend his complaint. See Opp. 6 [Doc. No. 128]. Federal

---

[5] In his Opposition, Merchia also alleges that M&M communicated with Merchia on October 7, 2020, to confirm receipt of the wire and to send Lamb's drafted lease agreement for advance occupancy. See Ex. 107 [Doc. No. 128-2]. As discussed, documents attached to the opposition are not properly before the court, and even if the court did consider them on a potential amended complaint, the October 7, 2020 email cannot be considered substantial action in an alleged conspiracy where the content of the email does not deviate from the terms of the agreement, and where any alleged plan to delay the closing date occurred after the email was sent. See 2d Am. Compl. ¶ 31 [Doc. No. 119] (alleging that Lamb and Krug exchanged emails on October 13, 2020, agreeing to a November closing date).

Case 4:20-cv-40100-IT  Document 119  Filed 03/17/22  Page 7 of 30

**above obscured stamp is: ECF 119, page 7 of 30**
**Exhibit 110 of opposition to MTD was described in the Operative Complaint [119]**

26. Nineteen minutes later, at 11:36 am, M&M confirmed their agreement with the plan of deceit by Mr. Klein responding to the deceit email with "Sounds good, let's see what happens," a copy of which email is also part of Ex. "103" hereto.

27. Between October 1, 2020 and October 7, 2020 Mr. Krug, Mr. Klein, and Attorney Lamb all exchanged emails that they were waiting for the funds to be wired and asking Attorney Lamb if he had received the funds.

28. On October 7, 2020, Dr. Merchia wired Lamb and Associates PC $400,000.

29. On October 8, 2020, Dr. Merchia agreed with Ek Jackson LLC to be Dr. Merchia's title nominee in consideration of Ek Jackson paying him $500,000 to have the property deeded to Ek Jackson LLC (Dr. Merchia had already paid $400,000 for the property and thus would make $100,000 from the transaction).

30. Dr. Merchia and the Merchia Entities entered into leases with Ek Jackson for the 30,000 square feet of space at the Property as follows: (1) 25,000 square feet as offices at $24 per square foot/year and (2) 5,000 square feet as storage at $14 per square foot/year[2]; and (3) 1,000 square feet as a short-term residence for $16,000 until August 31, 2021 after which time the short-term residence would be converted to office space for use as a sleep medicine clinical research laboratory. The total value of these rentals would be $670,000 for a base year and with the lease escalation clauses for the term of the leases would be $32,522,195.

31. Once the wire went through, Dr. Merchia requested the keys and occupancy of the Property. [through agent M&M (which is how all communication was pled)] Pascack refused to provide the key to or occupancy of the Property. Instead, Pascack [through its agent M&M (which is how all communication was pled)] insisted that the sale be delayed until sometime in November so that Pascack could avoid short-

---

[2] For the first 10.7 months, 1,000 square feet of the office space would be a temporary residence for Dr. Merchia personally and 2,500 square feet of storage space would be provided with that residence for a discounted price of $16,000 for the 10.7 months. Thereafter, the 1,000 square foot temporary residence would be converted to a clinical research sleep laboratory for CPAP19 and the storage space would also go to CPAP19.

7

Exhibit "110"

Plaintiff's opposition to Defendants' motions to dismiss

Exhibit 110's contents were pled in the operative complaint (ECF 119 #31-33)
.
Exhibit 110 is not discussed or mentioned in any of the court's orders.
.
Exhibits 110 clearly contradicts the Court's finding that "M&M had no further involvement after the September 30, 2020 counteroffer." (ECF 134 para 1).
.
Exhibit 110 clearly shows both M&M and Lamb providing "substantial assistance" to Krug in furthering the conspiracy after October 1, 2020 at 11:17am when Krug memorialized the conspiracy and both Lamb and M&M confirmed their agreement with the conspiracy (Exhibit 103 in ECF 119 page 21 of 30).

11



Pankaj Merchia <pm@vent19.com>

# FW: lease

> This is after Sept 30th

**Klein, Harrison** <Harrison.Klein@marcusmillichap.com>   Fri, Oct 9, 2020 at 4:22 PM
To: Pankaj Merchia <pm@vent19.com>
Cc: "Lyman, Mark" <Mark.Lyman@marcusmillichap.com>

Pankaj,

> ***Klein emails Dr. Merchia requiring accepting Lamb's handwritten changes that delayed closing and charged additional title costs in order for Dr. Merchia to get the keys he needed.

Please find attached. If you'd like we can send as a DocuSign. Once this is signed we are good to give you keys.

**Harrison Klein, CCIM**

*Associate*

**The Klein Group**



**Marcus & Millichap**

*100 High Street*

*Suite 1025*

*Boston, MA 02110*

(617) 896-7237 direct

(617) 896-7200 main

(305)401-4549 mobile

harrison.klein@marcusmillichap.com

License: MA9550567/FL:SL3235244

Follow us on:   NYSE: MMI

KleinGroupCRE.com

CONFIDENTIALITY NOTICE and DISCLAIMER: This email message is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please so advise the sender immediately. Nothing in this communication should be interpreted as a digital or electronic signature that can be used to authenticate a contract or other legal document. The recipients are advised that the sender and Marcus & Millichap are not qualified to provide, and have not been contracted to provide, legal, financial, or tax advice, and that any such advice regarding any investment by the recipients must be obtained from the recipients' attorney, accountant, or tax professional.

**From:** Marty Lamb <Marty@metrowestlaw.com>
**Sent:** Friday, October 9, 2020 4:11 PM
**To:** Berel Krug <berel@lbhrealestate.com>; Klein, Harrison <Harrison.Klein@marcusmillichap.com>
**Subject:** lease

Please see additional provisions.

***Lamb emails Klein scan of hand written changes with delayed closing and additional title costs

Marty Lamb
Lamb and Associates, P.C.

531 Concord Street, Holliston, MA 01746

508-429-9500
mailto:marty@metrowestlaw.com

**NOTE: CORONAVIRUS UPDATE FROM LAMB AND ASSOCIATES, P.C. (updated 4/1/2020)**

- *Governor Baker Expands Definition of Essential Services*

    Effective April 1 at noon, Governor Baker has ordered the expansion of essential services to include:

    - Staff at government offices who perform title search, notary, and recording services in support of mortgage and real estate services and transactions.
    - Residential and commercial real estate services, including settlement services.

    This order can be viewed here: https://www.mass.gov/info-details/covid-19-essential-services

We are set up for electronic filings for all registries where electronic filings are accepted.  Additionally, our title insurance underwriters have allowed us to close and insure transactions under "Gap" coverage in the event the Registries of Deeds are not open for business. We have also reached out to our title examiners and have been assured that, for the most part, title searches can and will be conducted online. While how we do business will be changing, we will be able to continue to serve our clients and their needs moving forward.

There are times when we must meet with clients in person for execution of documents. Please be assured that any such meeting will be scheduled to accommodate the client and the client's safety and comfort level. Any in person contact with a client will take place by appointment only. All client meetings will be private in order to maintain proper social distancing. We are following all health directives and advisories put forth by State and Federal authorities. The health and safety of our clients and staff are our top priority.

With this in mind,  we encourage all of our clients who are scheduled for closings in the upcoming weeks, to stay in contact with us by phone and email and we will do our best to keep you informed on any delays or re-scheduling.  Closings, both refinances and purchases, can take place remotely and by overnight mail with exceptions of those documents that need to be notarized in person. Therefore, each closing will be handled individually by utilizing the best method of completing the closing and at the same time follow social distancing and health safety practices as set forth by health authorities.

We will continue to closely monitor the situation and will provide updates to you as necessary. On behalf of Lamb and Associates, P.C, thank you for your business and support.



CONFIDENTIALITY NOTICE: This message is covered by the Electronic Communications Privacy Act, Title 18, United States Code, §§2510-2521. This e-mail message and any attached files are the exclusive property of Lamb and Associates, P.C. and are deemed privileged and confidential and are intended only for the person or entity to which it is addressed. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please so advise the sender immediately.

**From:** Lamb@cloudmail1.com <Lamb@cloudmail1.com>
**Sent:** Thursday, October 10, 2019 4:17 PM   ← Lamb's scanner had the wrong date and year, 2019 instead of 2020
**To:** Marty Lamb <Marty@metrowestlaw.com>
**Subject:** Message from KM_454e



SKM_454e19101016170.pdf
466K

This PDF attachment is on the following 7 pages.



## STANDARD FORM COMMERCIAL LEASE

MASSACHUSETTS ASSOCIATION of REALTORS'

This "Lease" is made this 8th day of October, 2020 by and between Pascack VA Group LLC, a(n) New York Limited Liability Company *[describe entity]* ("Landlord") and Ek Jackson LLC a(n) Minnesota LLC *[describe entity]* ("Tenant"). Pursuant to the terms of this Lease, Landlord agrees to lease the Premises (hereinafter defined) to Tenant and Tenant agrees to lease the Premises from Landlord on the terms set forth.

1. **Premises.** The "Premises" shall mean 1 Jackson St and 66 Jackson St in Worcester, MA _____, including the right to use the hallways, stairs, and elevators, for access to and egress from said Premises and nearest rest rooms, ~~in common with all others~~ exclusively of all others.

2. **Term.** The "Term" of this Lease shall be for the period of one year *[insert # of months or years]*, commencing on October 8, 2020 (the "Commencement Date") and ending on October 8, 2020 (the "Termination Date").

3. **Rent.** The "Rent" for the Premises for the Term of the Lease is twenty thousand dollars dollars ($20,000.xx), payable in ~~monthly installments of~~ a single installment at inception of twenty thousand dollars ($20,000.xx) ~~Not Applicable~~

Not Applicable- All boxed areas with Not Applicable are hereby stricken from this agreement.

~~advance on the ____ day of each calendar month. Rent shall be paid to ____. In addition, Rent that is not received by Landlord within~~ fourteen (14) days of the due date shall accrue interest at the rate of one and one half percent (1½%) per month for each month, or part thereof, that Rent remains unpaid from the due date. Tenant's agreement to pay Rent is independent of every other agreement in this Lease.

~~Not Applicable~~ **Adjustments to Rent.** Tenant agrees to pay a *Pro Rata* Share, as defined below, of the amount, if any, by which the Landlord's Expenses, as defined below, for each calendar year during the Term increases above the expenses for the Base Year, as defined below, ("Expense Increase") plus the amount, if any, by which Taxes, as defined below, for each calendar year during the Term exceeds the Taxes for the Base Year ("Tax Increase"). If the Expenses or Taxes in any calendar year decrease below the amount for the Base Year, Tenant's *Pro Rata* Share of Expenses or Taxes, as the case may be, for that calendar year shall be $0. Landlord shall provide Tenant with an estimate of the Expense Increase and of the Tax Increase for each calendar year during the Term in good faith. On the date Rent is due each month, Tenant shall pay Landlord a monthly installment equal to one-twelfth of Tenant's *Pro Rata* Share of Landlord's estimate of both the Expense Increase and Tax Increase. If Landlord does not provide Tenant with an estimate of the Expense Increase or the Tax Increase by the end of the first business day of a calendar year, Tenant shall continue to pay monthly installments based on the previous year's estimate(s) until Landlord provides Tenant with the new estimate. As soon as practicable after the end of a calendar year, Landlord shall furnish Tenant with a statement of the actual Expenses and Expense Increase and the actual Taxes and Tax Increase for the prior calendar year. Landlord shall apply any overpayment by Tenant against Rent due or next becoming due, provided if the Term expires before the determination of the overpayment, Landlord shall refund any overpayment to Tenant after first deducting the amount of Rent due. If the estimated Expense Increase or estimated Tax Increase for the prior calendar year is less than the actual Expense Increase or actual Tax Increase, as the case may be, for such prior year, Tenant shall pay Landlord, within thirty (30) days after its receipt of the statement of Expenses or Taxes, any underpayment for the prior calendar year.

Within one hundred eighty (180) days after receiving Landlord's statement of Expenses, Tenant may give Landlord written notice that Tenant intends to review Landlord's records of the Expenses for the calendar year to which the statement applies. Landlord shall make available all relevant records that are reasonably necessary for Tenant's review, within a reasonable time. Tenant shall be solely responsible for all costs, expenses and fees for the review. Within ninety (90) days after the records are made available to Tenant, Tenant shall have the right to

©2005 Massachusetts Association of REALTORS®    47207.0/361293/08.19.05


Statewide Standard Real Estate Forms

Charles River Properties LLC, 382 Watertown Street Newton, MA 02458    Phone: 6179011718    Fax:    Sample
Charles O'Neill    Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com



**Not Applicable**

give Landlord written notice identifying each objection to Landlord's statement of Expenses. If Tenant fails to give Landlord such notice of objection within the ninety (90) day period or fails to provide Landlord with a notice, exercising Tenant's right to review within the one hundred eighty (180) day period, Tenant shall be deemed to have approved and accepted Landlord's statement of Expenses and waives any objection to the Expenses for that year. Tenant shall have no right to review Landlord's records or to object to any statement of Expenses if any Rent is overdue on the date of Tenant's request or on the date that Tenant's objection.

"Expenses" - means all costs incurred in each calendar year in connection with operation, repairing, maintenance and management of the structure and the land on which the Premises is located, but not limited to: (a) labor costs, including wages, salaries, bonuses, taxes, insurance, uniforms, training, retirement plans and employee benefits; (b) management fees and the cost of operating a management office; (c) cost of services; (d) rental and purchase cost for tools, equipment, parts and supplies; (e) accounting costs (f) insurance premiums and deductibles; (g) utility costs; and (h) the amortized cost of capital improvements.

"*Pro Rata* Share"- means the percentage of the total that is determined by dividing the rentable square feet of the Tenant's Premises by the total rentable square feet in the structure in which the Premises is located. For purposes of this calculation all parties agree that the rentable square feet of the Premises is _____ sq. ft. and that the total rentable square feet of the structure in which the Premises is located is _____ sq. ft. For purposes of this calculation the Taxes and Expenses are to be calculated as though the structure is fully occupied.

"Taxes" - means (a) all real property taxes on the land and structure in which the Premises is located; (b) all excise and personal property taxes for property that is owned by Landlord and used in connection with the operation, maintenance and repair of the land and structure in which the Premises is located; and (c) all costs and fees incurred in connection with any effort to reduce tax liabilities, including any costs incurred by Landlord to review, comply with or appeal tax liabilities. Tenant shall pay Landlord the amount of Tenant's Pro Rata Share of any such increase in the Tax Excess within thirty (30) days after Tenant's receipt of a statement from Landlord.

"Base Year" - with regard to Expenses means the calendar year immediately preceding the Commencement Date; and with regard to Taxes means the fiscal year (July 1 to June 30) immediately preceding the Commencement Date.

**Utilities of Heat, hot Water, and electricity are included in rent.**
**Remainder of boxed area is Not Applicable**

4. **Utilities / Cleaning.** Tenant agrees to pay, as they become due, the charge for electricity, water and other utilities furnished to the Premises that are separately metered, including fuel for heat and electricity for air conditioning. Except as provided above, the Landlord shall supply hot and cold water, heating, ventilating and air conditioning ("HVAC") service to the Premises and to the common hallways, stairways, elevators and restrooms during normal business hours. The Tenant shall have the right to receive HVAC service during hours other than normal business hours, at Tenant's sole expense, *provided that* reasonable advance notice, as specified by Landlord, has been given. The Landlord shall provide cleaning or janitorial services according to the custom and practice for premises of similar type and size. The Landlord shall have no other obligation to provide any equipment or utilities within the Premises. No utilities for use within the Premises shall be installed or connected by Tenant without written authorization from Landlord. The Landlord shall have no liability for non-delivery or interruption of utilities to Tenant and Tenant shall have no right to abate Rent on account of same.

5. **Condition and Possession.** Landlord agrees to maintain the structure of any building of which the Premises is part in the same condition as the structure is on the Commencement Date, excepting reasonable wear and tear and damage by fire and other casualty. The Premises are accepted by Tenant in "as is" condition and without any other warranty or representation from Landlord. The Landlord shall not be liable for any failure to deliver possession of the Premises or any other space due to the holdover or unlawful possession of such space by any party. In such event, the Commencement Date for such space shall be postponed until the date Landlord delivers possession of the Premises to Tenant free from occupancy by any party. In the event that the Tenancy is interrupted or terminated as a result of *Force Majeure* or other act beyond the control of the Landlord, as defined in paragraph 23, shall not render Landlord liable to Tenant, constitute a constructive eviction of Tenant, give rise to an abatement of Rent, nor relieve Tenant from the obligation to fulfill any covenant or agreement. Tenant agrees that Tenant shall have the duty to comply with the requirements of the Americans With Disabilities Act ("ADA") concerning use of the Premises and Tenant agrees to indemnify and defend Landlord with regard to any claim alleging violation of the ADA or similar law or regulation.

**Not Applicable**

6. **Security Deposit.** Tenant shall pay a "Security Deposit" to Landlord in the amount of _____ dollars ($_____) upon the execution of this Lease.

2





Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com      Sample

<div style="border:1px solid #000; padding:8px;">
<u>Not Applicable</u> ~~The Security Deposit shall be maintained by Landlord, without interest, as security for the performance of Tenant's obligations. The Security Deposit is not an advance payment of Rent nor a measure of damages. Landlord may use or apply all or part of the Security Deposit to satisfy past due Rent or to cure any Default of Tenant. If Landlord uses or applies any part of the Security Deposit, Tenant shall, upon demand, replenish the Security Deposit to its original amount, within thirty (30) days. Landlord agrees to return any remaining balance of the Security Deposit to Tenant within forty-five (45) days after: a) the date Tenant surrenders the Premises to Landlord; or b) final determination of the Rent due from Tenant; whichever is later. Landlord shall not be required to hold the Security Deposit in a separate account.~~
</div>

7. **Permitted Use.** The Premises shall be used for <u>lawful purposes.</u>

No other use of the Premises is permitted. Tenant shall not use the Premises in a manner that interferes with the quiet enjoyment of any property or premises owned or occupied by any other person. Tenant shall comply with all statutes, codes, ordinances, orders, rules and regulations of each municipal, state or other governmental entity ("Laws"), regarding the conduct of Tenant's business and the use, condition, maintenance and occupancy of the Premises. No oil or hazardous material and no toxic material or substance, including any material or substance, defined or regulated by Massachusetts General Laws Chapter 21E, Section 1 et seq., shall be brought to or permitted to remain at the Premises. Tenant shall not make any use of the Premises that renders the Premises uninsurable or that materially increases the cost of insurance to Landlord. The Tenant shall not make any ~~improvement or~~ structural change to the Premises ~~or erect a sign~~ without written consent of the Landlord. Reasonable non-structural changes may be within the Premises with prior authorization of the Landlord and Landlord agrees that consent shall not be unreasonably delayed or withheld. At the Termination Date any alterations or improvements made by the Tenant that remain at the Premises shall become the sole property of the Landlord. Landlord may, by written notice to Tenant at least thirty (30) days prior to the Termination Date, require Tenant, at Tenant's sole expense, to remove any alteration or improvement installed by or for the benefit of Tenant.

8. **Entry by Landlord.** Landlord has the right to enter the Premises to inspect ~~or show the Premises~~, to clean and make repairs, improvements or additions and to perform maintenance, repairs, improvements or additions to any portion of the structure in which the Premises is located. Landlord shall provide Tenant with reasonable prior verbal notice before entry, except that notice is not required in case of emergency, as determined in Landlord's sole discretion. Entry by Landlord shall neither constitute a constructive eviction nor entitle Tenant to an abatement or reduction of Rent. Email notice will also be sent.

9. **Assignment and Subletting.** Tenant shall not assign, sublease, transfer or encumber any interest in this Lease or allow any third party to use or occupy any portion of the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld. Within fourteen (14) business days after receipt of signed copies of any assignment, sublease, transfer or encumbrance and any other information as the Landlord requests, Landlord shall either: a) consent to the assignment, sublease, transfer or encumbrance by executing a consent agreement in a form satisfactory to Landlord; b) refuse to consent to the Transfer; or (c) exercise its right to recapture any portion of the Premises that Tenant proposes to assign, sublease, transfer or encumber. Tenant shall pay Landlord as additional rent fifty percent (50%) of all rent and other consideration that Tenant receives as a result of any assignment, sublease, transfer or encumbrance that is in excess of the Rent payable to Landlord for the relevant portion of the remaining Term. If Tenant is in default, Landlord may require that all sublease payments be made directly to Landlord, in which case Tenant shall receive a credit against Rent in the amount of Tenant's share of payments received by Landlord.

10. **Liens.** Tenant shall not permit a mechanic's lien or other lien to be placed upon the land or structure in which the Premises is located in connection with any work done by or for the benefit of Tenant. Tenant shall, within ten (10) days of notice from Landlord, fully discharge any lien by settlement, by bonding or by insuring over the lien in the manner prescribed by Law. If Tenant fails to do so, Landlord may bond, insure over or otherwise discharge the lien. Tenant shall reimburse Landlord for any amount paid by Landlord, including, without limitation, reasonable attorneys' fees.

11. **Indemnification and Waiver.** Tenant hereby waives all claims against and releases Landlord and its officers, directors, employees, trustees, beneficiaries, partners, mortgagees and each of their successors and assigns from all claims for any injury to or death of persons, damage to property or business loss in any manner related to: a) any act of a third party; b) any act of God; c) bursting or leaking of any tank, pipe, drain or plumbing fixture; d) failure of any security service, personnel or equipment; or e) any *Force Majeure* or other matter outside of the reasonable control of Landlord. Except to the extent caused by the negligent or willful misconduct of

3




Landlord, Tenant agrees to indemnify, defend and hold Landlord harmless from all claims, debts, demands, liabilities, obligations, damages, penalties, costs and expenses, including, without limitation, reasonable attorneys' fees and expenses, that may be imposed by or against Landlord arising out of or in connection with any damage or injury occurring in the Premises or any acts or omissions of Tenant or any of Tenant's guests, invitees, assignees, subleasees, contractors or licensees.

**12. Insurance.** Tenant shall maintain the following insurance ("Tenant's Insurance"): a) commercial general liability insurance applicable to the Premises and its appurtenances providing, on an occurrence basis, a minimum combined single limit of  five hundred thousand  xxxx                              dollars ($ 500,000      ); b) property / business interruption insurance issued on an all risk or special perils form, with coverage for water damage including earthquake sprinkler leakage, at replacement cost value and with a replacement cost endorsement covering all of Tenant's equipment fixtures, furniture, inventory, merchandise and other personal property in the Premises as well as any leasehold improvements for the benefit of the Tenant; c) workers' compensation insurance to the extent required by law and in amounts as may be required by applicable statute and employers liability coverage of at least $ 100,000        per occurrence. Each commercial general liability insurance policy shall name Landlord (or its successors and assignees) and their respective officers, directors, employees, and agents, and other designees of Landlord and its successors as the interest of such designees shall appear, as additional named insureds. All policies of Tenant's Insurance shall contain endorsements that the insurer(s) shall give Landlord and its designees at least thirty (30) days' advance written notice of any cancellation, termination, material change or lapse of insurance. Tenant shall provide Landlord with a certificate of insurance evidencing Tenant's Insurance no later than the Commencement Date or the date Tenant is provided with possession of the Premises, whichever is earlier. During the Term the Tenant shall provide evidence of renewal or existence of such insurance as necessary to assure that Landlord always has current certificates evidencing Tenant's Insurance.

Not Applicable  **Broker's Fee.** The Landlord agrees to pay broker(s), _____.
duly licensed Massachusetts real estate broker(s), a fee of _____
dollars ($_____) for services rendered in connection with the lease of the Premises. The Tenant represents and warrants that Tenant has not dealt with any other broker in connection with rental of the Premises and agrees to indemnify, defend and hold Landlord harmless from any claim, demand or liability of any other person seeking payment for services provided to Tenant in connection with leasing the Premises.

**14. Subrogation.** Landlord and Tenant hereby waive and shall cause their respective insurance carriers to waive any and all causes of action, claims, actions and rights of recovery against the other for any loss or damage with respect to Tenant's personal property, leasehold improvements, the structure in which the Premises is located, the Premises or any contents thereof, including rights, claims, actions and causes of action based on negligence, which loss or damage is (or would have been, had the insurance required by this Lease been obtained) covered by insurance.

**15. Fire or Casualty.** The Landlord has the right to terminate this Lease if all or any part of the Premises is damaged by fire or other casualty to the extent that it cannot reasonably be repaired within one hundred (100) days after the date of such fire or casualty. This right of termination is exercisable by written notice to Tenant within sixty (60) days of the date of the fire or other casualty. If this Lease is not terminated, Landlord shall promptly and in good faith, seek to restore the Premises. Such restoration shall be to substantially the same condition that existed prior to the fire or other casualty, except for modifications required by law. Upon notice from Landlord, Tenant shall assign to Landlord (or Landlord's designee) all property insurance proceeds payable to Tenant under Tenant's Insurance with respect to any leasehold improvements for the benefit of Tenant; provided that if the estimated cost to repair such leasehold improvements exceeds the amount of insurance proceeds received by Landlord from Tenant's insurance carrier, the excess cost of such repairs shall be paid by Tenant to Landlord prior to Landlord's commencement of repairs. Within fourteen (14) days of demand, Tenant shall also pay Landlord for any excess costs identified during the course of repair work. Landlord shall not be liable for any inconvenience to Tenant, or injury to Tenant's business resulting in any way from the fire or other casualty or the repair work. Provided that Tenant is not in default, during any period of time that all or a material portion of the Premises is rendered unusable as a result of the fire or other casualty, the Rent shall abate for the portion of the Premises that is unusable.

**16. Eminent Domain.** Either party may terminate this Lease if any substantial part of the Premises is taken or condemned for any public use under law or by eminent domain. Landlord shall also have the right to terminate this Lease if there is such a taking of any portion of the structure in which the Premises is located or the land on which it is situated that would have a material adverse impact on Landlord's ability to operate the remainder of the

4




structure/land. The terminating party shall provide written notice of termination to the other party within sixty (60) days after first receipt of any notice of the taking. The termination shall be effective on the date the taking becomes effective. All compensation awarded for a taking, or sale proceeds, shall be the property of Landlord.

**17. Tenant's Default.** A "Tenant's Default" shall mean and include a circumstance when a) the Tenant fails to pay all Rent when due, if such failure continues for three (3) business days after written notice to Tenant which notice shall be in satisfaction of, and not in addition to, notice required by Law; or b) Tenant's failure to comply with any term, condition, requirement or covenant of this Lease (other than non-payment of Rent), if such failure is not cured within thirty (30) business days after written notice to Tenant, which notice shall be in satisfaction of, and not in addition to, notice required by law; or c) Tenant is declared bankrupt or insolvent or if any property of Tenant is the subject of an assignment for the benefit of creditors.

**18. Landlord's Remedies.** In the event of a Tenant's Default, Landlord shall have the right to terminate this Lease or terminate Tenant's right to possession. Upon receipt of a notice of termination Tenant shall immediately surrender the Premises to Landlord. If Tenant fails to surrender the Premises, Landlord may enter upon and take possession of the Premises, in compliance with law. Notwithstanding the foregoing, the Tenant shall pay Landlord all past due Rent and other damages, losses and expenses suffered by Landlord as a result of Tenant's Default. Those costs and expenses shall include the costs and expenses incurred in reletting or attempting to relet the Premises, including reasonable attorneys' fees, brokerage fees, the cost of physical alterations to the Premises and the reasonable value of other allowances or concessions granted to a new tenant. The Landlord has the right to collect all rents and other payments from any reletting. The Landlord shall not be responsible or liable for any delay or inability to relet all or part of the Premises or for the failure to collect any rent. In lieu of determining damages as described above, Landlord may elect to receive as damages the sum of a) all Rent accrued through the date of termination of this Lease or of Tenant's right to possession, and b) an amount equal to the total Rent that Tenant would have been required to pay for the remainder of the Term discounted to present value, minus the then present fair rental value of the Premises for the remainder of the Term, comparably discounted, after deducting all anticipated costs of reletting. If Tenant is in default of any of the non-financial duties under the Lease, Landlord shall have the right to perform such duties. Upon demand, Tenant shall reimburse Landlord for the cost of such performance plus an administrative fee equal to ten percent (10%) of the cost of the work performed. Termination of Tenant's Lease or right to possession or Landlord's entry on all or part of the Premises shall not relieve Tenant of its duties and liabilities under the Lease. Each right and remedy of the Landlord shall be separate and in addition to any other right and remedy now available or hereafter available to Landlord.

**19. Landlord's Default.** Before filing suit for any alleged default by the Landlord, Tenant shall give Landlord and each Mortgagee about whose identity Tenant has been notified, written notice and a reasonable time to cure the alleged default. In the event of a default by the Landlord in the terms of this Lease, no individual officer, director, agent, servant, employee, trustee, stockholder or beneficiary of the Landlord shall be personally liable for performance of the Landlord's obligations.

**20. Subordination.** Tenant agrees that this Lease is subject to and subordinate to each mortgage, ground lease or other lien now or subsequently arising on the Premises, or on the land or structure in which the Premises is located. Tenant's agreement applies to any refinancing, renewal, modification, and extension of the mortgage. Upon request from the holder of a mortgage, Tenant shall execute a commercially reasonable subordination agreement. As an alternative, any mortgagee shall have the right, at any time, to subordinate its mortgage to this Lease. Upon request, Tenant shall deliver a commercially reasonable estoppel certificate to those parties as are reasonably requested by Landlord, without payment, within ten (10) days after receipt of a written request.

**21. Notice / Addresses.** All demands, approvals, consents or notices shall be in writing and delivered by hand or sent by registered or certified mail with return receipt requested, or sent by overnight or same day service by hand at the party's respective address, set forth below. Each notice shall be deemed to have been received on the date of actual delivery or the date on which delivery is refused, whichever is earlier. If Tenant has vacated the Premises without providing a new address, each notice to Tenant shall be deemed to have been received three (3) days after notice is deposited in the mail of the United States Postal Service or with a delivery service as described above. Either party may, at any time, change the address set forth below (other than to a post office box) by giving the other party written notice of the new address.


MASSFORMS™
Statewide Standard Real Estate Forms

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com   Sample



| Landlord: | Tenant: |
|---|---|
| Pascack VA Group LLC | EkJackson LLC |
| 501 Chestnut Ridge Rd | 617 Boylston St |
| Suite 310 | Brookline, MA 02445 |
| Spring Valley, NY 10972 | ekJackson@rvpCorp.com |

**22. Surrender of Premises.** At the termination of this Lease or Tenant's right of possession, Tenant shall remove all personal property and surrender the Premises to Landlord in good order and in "broom clean" condition, ordinary wear and tear and damage excepted, removing, as requested by Landlord, any improvements or alterations made by Tenant. If Tenant fails to remove any of Tenant's personal property within two (2) business days after termination, Landlord, at Tenant's sole cost and expense, shall be entitled to remove and store Tenant's personal property. Landlord shall not be responsible for the safekeeping or preservation of Tenant's personal property. Tenant shall pay Landlord, upon demand, all costs of storage. If Tenant fails to remove Tenant's personal property from the Premises or from storage within thirty (30) days after delivery of notice, Landlord may deem all or any part of Tenant's Property to be abandoned and title to that property shall vest in Landlord. If Tenant fails to remove any of the alternations or improvements made by Tenant by the Termination Date and complete related repairs in a timely manner, Landlord may perform such work at Tenant's expense. If Tenant fails to surrender all or any part of the Premises at the termination of this Lease, occupancy of the Premises after termination shall be that of a tenancy at sufferance. Tenant's occupancy shall be subject to all the terms and provisions of this Lease and Tenant shall pay an amount (on a per month basis without reduction for partial months during the holdover) equal to two hundred percent (200%) of the sum of the Rent and of the Additional Rent due for the period immediately preceding the holdover. No holdover by Tenant or acceptance of payment from the Tenant after the termination of this Lease shall extend the Term or prevent Landlord from immediate recovery of possession of the Premises.

**23. Miscellaneous.**

**1) Time / Force Majeure.** Time is of the essence of each provision of this Lease. The failure or delay of either party to declare a default immediately upon its occurrence or a delay in taking action for a default shall not constitute a waiver. Whenever a period of time is prescribed for the taking of an action by Landlord or Tenant (other than the payment of the Security Deposit or Rent), the period of time for the performance of such action shall be extended by the number of days that the performance is actually delayed due to strikes, acts of God, shortages of labor or materials, war, terrorist acts, civil disturbances and other causes beyond the reasonable control of the performing party ("*Force Majeure*"). *Force Majeure* does not include financial difficulties of a party.

**2) Attorneys' Fees / Costs Of Suit.** If either party commences suit for violation of or to enforce any covenant, term or condition of this Lease, the prevailing party shall be entitled to reasonable attorneys' fees, costs and expenses. Landlord and Tenant hereby waive any right to trial by jury in any proceeding based upon a breach of this Lease.

**3) Sale / Assignment.** Landlord shall have the right to transfer and assign, in whole or in part, all of its ownership interest, rights and obligations in the Lease, including the Security Deposit, and upon transfer Landlord shall be released from any further obligations hereunder, and Tenant agrees to look solely to the successor in interest of Landlord for the performance of such obligations and the return of any Security Deposit.

**4) Entire Agreement.** This Lease constitutes the entire agreement between the parties and supersedes all prior agreements and understandings related to the Premises. This Lease may be modified only by a written agreement signed by Landlord and Tenant. This Lease shall be interpreted and enforced in accordance with the Laws of the Commonwealth of Massachusetts.

**5) Executive Order 13224.** Tenant represents and warrants to Landlord that each individual executing this Lease on behalf of Tenant is authorized to do so on behalf of Tenant and that Tenant is not, and the entities or individuals constituting Tenant or which may own or control Tenant or which may be owned or controlled by Tenant are not, among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists.




### 24. Additional Provisions

Notwithstanding anything to the contrary above:

Tenant is the title nominee of Dr. Pankaj Merchia for 1 Jackson St, Worcester, MA pursuant to an email agreement between Dr. Merchia and Seller dated Wed, Sep 30, 2020 at 9:53 PM, *with closing date changed to Nov. 6, 2020*

Tenant hereby authorizes attorney Marty Lamb to immediately release to Landlord $20,000 from the $400,000 wired by Dr. Merchia to Lamb and Associates on 10/7/2020 as rent pursuant to this agreement.

The previously agreed upon purchase price for Premises of $400,000 in the email agreement dated Wed, Sep 30, 2020 at 9:53 PM is hereby reduced to $380,000.

Tenant may sublease space to Vent 19 Corp, Dr. Pankaj Merchia, and others.

*Closing fees and adjustments to be made according to Massachusetts customary practices. Buyer to pay all title fees. Buyer's acceptance of the Premises under this lease shall serve as Buyer's acceptance of the Premises for purposes of closing. Buyer waives any and all claims as to the condition of the Premises and accepts it in its "as is" condition.*

> ***Closing delay to save on taxes was part of conspiracy.

> ***Sept 30th offer was for a "recorded deed" for a fixed price which means Seller would have paid title recording fees. "Extra Costs" was part of conspiracy.

IN WITNESS WHEREOF, the parties have set forth their hands and seals.

P. Merchia                         10/8/2020
TENANT or authorized agent    Date        LANDLORD or authorized agent    Date

_____  _____
TENANT or authorized agent     Date

> ***The above hand-written changes were made ***AFTER*** Dr. Merchia had already signed.
>
> ***Merchia signed on October 8, 2020 as shown above.
>
> ***The email chain in this "Exhibit 110" with this "Standard Form Commercial Lease" attachment "SKM_454e19101016170.pdf" shows ----"substantial assistance [with] tortious conduct by M&M [and Lamb]" ---- in contradiction to the court's finding in ECF #134 p 7 para 2.
>
> ***This email chain shows:
>
> ***Lamb emailed the hand written changes above which delayed closing and charged extra title recording fees to Klein on October 9, 2020 at 4:11 PM (ECF #128 p 46).
>
> ***Klein emailed the hand written changes above to Dr. Merchia on Oct 9, 2020 at 4:22 PM tortiously requiring Dr. Merchia to accept the changes in order to get "keys" to the property for which he had already wired $400k for a "recorded deed" by "October 21, 2020" based on the Sept 30th Offer (SAC in ECF 119 page 5 point 17).